**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

SHERRYGAY CHAMPAGNIE,

Plaintiff,

v. Case No.: 3:25-cv-518-WWB-PDB

PACE CENTER FOR GIRLS, INC. and
MARY MARX,

Defendants.
_________________________________/

**ORDER**

THIS CAUSE is before the Court on Defendants' Motion to Dismiss Second Amended Complaint (Doc. 48)[1] and Plaintiffs' Opposition (Doc. 51). For the reasons set forth below, Defendant's Motion will be granted.

## I. BACKGROUND

Plaintiff, Sherrygay Champagnie, is a black woman of Jamaican national origin. (Doc. 46, ¶ 5). Plaintiff worked as a math teacher for Defendant, Pace Center for Girls, Inc, ("**PCGI**") at the Collier Center in Immokalee, Florida from April 6, 2020, until her "constructive discharge" on September 1, 2021. (*Id.* ¶¶ 5, 17). PCGI is a non-profit corporation headquartered in Jacksonville, Florida that operates educational centers throughout Florida. (*Id.* ¶ 10). Defendant Mary Marx was the Chief Executive Officer of PCGI during the relevant times of Plaintiff's employment. (*Id.* ¶ 11). Plaintiff alleges that

[1] After Defendants filed their Motion to Dismiss, Plaintiffs Rosene Johnson, Anne-Marie Mavenyengwa, LaVita Johnson-Spears, and Chantell Miles settled their claims against Defendants. (*See* Doc. 64 at 1; Doc. 66 at 1; Doc. 72 at 1). Therefore, the Court's analysis is limited to the claims asserted only by Plaintiff Champagnie.

Defendants engaged in a "systematic pattern and practice of racial discrimination" against her and other black employees beginning in the spring of 2021. (*Id.* ¶¶ 15–16).

Champagnie was supervised by Tim Snyder, a white male. (*Id.* ¶ 17). Plaintiff alleges she began to face discriminatory treatment in the fall of 2020 from Snyder. (*Id.* ¶ 19). On various occasions, Plaintiff alleges Snyder would "barge into her classroom" to solicit negative feedback from students without notice, and "disclosed her medical information to students without consent." (*Id.* ¶¶ 19, 21). Snyder allegedly dismissed "student verbal abuse" toward Plaintiff by saying she was "too sensitive because she was Jamaican" and "that is how they are in Jamaica." (*Id.* ¶ 24). Snyder also, in front of students, allegedly told Plaintiff that she could not vote because she is not a citizen, causing students to ask if she was "illegal." (*Id.* ¶ 23).

According to Plaintiff, Snyder would also invasively surveil her by following her to restrooms and waiting outside for her. (*Id.* ¶¶ 19, 22). Other times, Snyder would allegedly physically grab her arm to demand meetings, including meetings outside of work hours. (*Id*. ¶¶ 21–22). Snyder allegedly did not treat other white, non-Jamaican teachers the same way, including Laurel Sandidge, a science teacher, and Mike Miller, an English teacher. (*Id.* ¶¶ 20, 25). Because of Snyder's alleged conduct, Plaintiff reported him to Executive Director Marianne Kearns on October 20, 2020, and November 2, 2020, and to PCGI's Human Resources Manager, Shannon McQuinn, multiple times between October 2020 and May 2021. (*Id.* ¶¶ 26–27). Neither Kearns nor McQuinn took any corrective measures. (*Id.*).

After Plaintiff filed her complaints, her alleged mistreatment grew. Staff would allegedly call her "N----r," "B---h," and "C--t," with the consent of Snyder and Kearns. (*Id.*

¶ 28).[2] Snyder increasingly interrupted Plaintiff's classroom and engaged in stalking behavior. (*Id.*). On April 26, 2021, English teacher Mike Miller allegedly banged on an office door so loudly while Plaintiff was on an emergency medical call that her physician asked if he should call police. (*Id.* ¶ 30). In fear for her safety, Plaintiff began to hide in locked classrooms and only moved to and from her classroom and vehicle with an escort. (*Id.* ¶ 28). Kearns allegedly dismissed Plaintiff's concerns as a product of anxiety and told her that she should not tell others she was harassed. (*Id.* ¶ 31). Kearns also told Plaintiff that Snyder would not be removed and that anything she said would get back to management. (*Id.*).

Plaintiff later reported both Snyder and Kearns to PCGI's Chief Financial Officer, Thresa Giles, on May 6 and 7, 2021. (*Id.* ¶ 32). According to Plaintiff, an investigation conducted by PCGI's in-house counsel substantiated her allegations of harassment. (*Id.*).[3] As a result of that investigation, Plaintiff alleges that PCGI leadership, including Marx, initially arrived at the Collier Center to terminate both Kearns and Snyder. (*Id.* ¶ 33). However, Marx instead ordered a second investigation into Plaintiff's claims, which ultimately reached an opposite conclusion. (*Id.*). Plaintiff alleges that neither she nor any corroborating witness were interviewed in the second investigation. (*Id.*).

---

[2] Plaintiff also alleges that staff members disparaged others on the basis of national origin. For instance, Plaintiff alleges that, on January 6, 2021, Snyder "condoned staff members discussing how to harm Vice President Kamala Harris, 'the Jamaican.'" (Doc. 46, ¶ 29). She further alleges that a Program Director, Kelly Starke, "laughed" at that discussion and "allowed [it] to continue." (*Id.*).

[3] Plaintiff alleges she faced retaliation from Kearns after this first investigation. At one point, Kearns asked Plaintiff, "why are you still here?" (Doc. 46, ¶ 34).

After the second investigation was finished, PCGI allegedly prohibited Plaintiff from entering the Collier Center, denied her request for a transfer to a nearby center, and offered to transfer her to the Citrus Center approximately 230 miles away. (*Id.* ¶ 35). PCGI then denied Plaintiff's request for relocation assistance, which Plaintiff alleges forced her constructive discharge on September 1, 2021. (*Id.* ¶ 36). Based on the foregoing, Plaintiff brought this suit, alleging that Defendants are liable to her for discrimination, retaliation, hostile work environment, and constructive discharge pursuant to 42 U.S.C. § 1981. (*Id.* ¶¶ 41–83).

## II. LEGAL STANDARD

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." In determining whether to dismiss under Rule 12(b)(6), a court accepts the factual allegations in the complaint as true and construes them in a light most favorable to the non-moving party. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1269 (11th Cir. 2009). Nonetheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, "naked assertions devoid of further factual enhancement" are insufficient. *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (internal quotation marks omitted)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III. DISCUSSION

### A. Racial and National Origin Discrimination

Plaintiff raises two claims for discrimination under § 1981, one for race-based discrimination and another for discrimination based on national origin. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). "Although § 1981 does not itself use the term race, the [Supreme] Court has construed the section to forbid all racial discrimination in the making of private as well as public contracts." *Fitzpatrick v. Koch Foods of Ala., LLC*, No. 2:19-cv-553, 2023 WL 3937421, at *9 (M.D. Ala. June 9, 2023) (quoting *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987)).

The plain text of § 1981 "applies to claims of discrimination based on race, not national origin." *Tippie v. Spacelabs Med., Inc.*, 180 F. App'x 51, 56 (11th Cir. 2006); *see also Bodya v. Hilti, Inc.*, 159 F. App'x 91, 92 (11th Cir. 2005). Nonetheless, "national origin discrimination" in some contexts can be "so closely related to racial discrimination as to be indistinguishable." *Bullard v. OMI Ga., Inc.*, 640 F.2d 632, 634 (5th Cir. 1981) (quotation omitted)[4]; *see Saint Francis Coll.*, 481 U.S. at 613 (holding that the history of

---

[4] The Eleventh Circuit adopted all former Fifth Circuit decisions made before October 1, 1981, as binding precedent. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

§ 1981 shows that "Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics" even if that would not "be classified as racial in terms of modern scientific theory"). "Thus, while discrimination purely on the basis of national origin does not create a cause of action under section 1981," binding precedent holds that a complaint "alleging racial and ethnic discrimination clearly states a cause of action under the statute." *Bullard*, 640 F.2d at 634 (quotation omitted).

Count II of Plaintiff's Second Amended Complaint asserts a stand-alone claim for discrimination under 42 U.S.C. § 1981 based solely on national origin. That is not permissible. *Moeinpour v. Bd. of Trs. of Univ. of Ala.*, No. 2:21-cv-1302, 2022 WL 164999, at *1 n.1 (N.D. Ala. Jan. 18, 2022) ("Section 1981 does not provide a cause of action for national origin discrimination; that statute relates only to race discrimination."); *see also Edwards v. Prime, Inc.*, No. 08-AR-1016, 2008 WL 9393800, at *9 (N.D. Ala. Dec. 11, 2008) (holding that § 1981 does not authorize a cause of action for sex or national-origin discrimination and dismissing stand-alone claims of each). Therefore, Count II must be dismissed.

However, the Court's dismissal of Count II does not mean that the allegations concerning Plaintiff's national origin are irrelevant to Count I, which raises a claim for racial discrimination. For instance, Plaintiff alleges that her co-workers would explicitly call her racial slurs with the knowledge and support of her supervisors, and that those same supervisors dismissed her sensitivity to discrimination because she was Jamaican. (Doc. 46, ¶¶ 24, 28). As such, the Court finds that Count I may rely on a relationship

between national-origin and race-based discrimination and will consider both to discern whether Plaintiff has plausibly alleged a case for discrimination overall.

Defendant argues that Plaintiff's discrimination claim fails because it does not allege an adverse employment action under the *McDonnell Douglas*[5] evidentiary framework. However, "neither *McDonnell Douglas* nor 'convincing mosaic' is a pleading standard that should be used at the Rule 12(b)(6) stage." *Davis v. Miami-Dade Cnty.*, No. 23-12480, 2024 WL 4051215, at *2 (11th Cir. Sept. 5, 2024); *see also Martinez-Lopez v. GFA Ala. Inc.*, 797 F. Supp. 3d 1309, 1364 (N.D. Ga. 2025) (describing the *McDonnell Douglas* framework as "useful for guidance purposes" at the pleading stage). Rather, "in order to state a claim under § 1981, [plaintiff] must" plausibly "allege (1) intentional racial discrimination (2) that caused a contractual injury." *Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291, 1296 (11th Cir. 2021).[6] "A contractual injury includes any injury relating to 'the making, performance, modification, [or] termination of [the] contract[ ],' or to 'the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Id.* (quoting 42 U.S.C. § 1981(b)).

Here, Plaintiff has alleged that she had a contractual relationship with PCGI to teach mathematics to students at the Collier Center. She alleges she was abruptly barred from the Collier Center, thus prohibited from performing her job, and given a transfer to the Citrus Center approximately 230 miles away, which Plaintiff alleges would impose a seven-hour commute. That changed condition could qualify as a contractual injury. *See*

[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[6] There is no dispute Plaintiff has sufficiently alleged that she is a member of a racial minority. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1271 (11th Cir. 2004); (Doc. 46, ¶ 5).

*Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024) ("Many forced transfers leave workers worse off respecting employment terms or conditions. (After all, a transfer is not usually forced when it leaves the employee better off.)."); *see also Walker v. Baptist Health Sys., Inc.*, No. 3:25-cv-588, 2025 WL 3902262, at *8 (M.D. Fla. Dec. 15, 2025) (reasoning that a Plaintiff being forced to "float" between hospital departments could constitute a disadvantageous change of the place of work), *report & recommendation adopted*, 2026 WL 49811 (M.D. Fla. Jan. 7, 2026).

Nevertheless, the Second Amended Complaint fails to plausibly allege that this contractual injury was motivated by intentional racial discrimination. Critically, the Complaint does not identify a decision-maker. *See Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002) ("When evaluating a charge of employment discrimination . . . we must focus on the *actual knowledge and actions of the decision-maker*." (emphasis added)); *see also Obukwelu v. Tallahassee Mem'l Healthcare, Inc.*, No. 4:15-cv-55, 2017 WL 11672903, at *3 (N.D. Fla. Mar. 24, 2017) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case." (quoting *Holifield v. Reno*, 155 F.3d 1555, 1563–64 (11th Cir. 1997))). Although Plaintiff includes one allegation that "Defendant PCGI, through its agents and employees, including Kearns, Snyder and Defendant Marx individually, discriminated against Plaintiff because of her race," (Doc. 46, ¶ 47), the Second Amended Complaint does not identify who made the decision to bar Plaintiff from the Collier Center and transfer her to the Citrus Center, or even state what parties were involved in those decisions. The closest Plaintiff gets to identifying a decision-maker is her allegation that "PCGI leadership, including Defendant Marx" arrived at the Collier

Center sometime after May 7, 2021, to terminate Kearns. (*Id.* ¶¶ 32–33). But Plaintiff does not specify whether this applies to any of the decisions made about her.

Even if Plaintiff were to argue that Snyder, Kearns, and Marx were all decision-makers, Plaintiff does not plausibly allege how any were motivated by *racial* animus. As to Snyder, the Second Amended Complaint appears to focus on his references to Plaintiff's Jamaican national origin and citizenship, and points to conduct surrounding those statements. (Doc. 46, ¶¶ 19, 21–24). Those characteristics are distinct from race. To the extent that Plaintiff believed Snyder used Plaintiff's national origin as a proxy for her race or ethnic characteristics, Plaintiff fails to allege factual matter suggesting as much. *Faulk v. City of Orlando*, 731 F.2d 787, 790 (11th Cir. 1984) (holding that "ill treatment . . . without reference to" racially or ethnically "discriminatory intent" fails to state of claim of intentional discrimination in violation of § 1981). In fact, the Second Amended Complaint does not even allege that Snyder used Plaintiff's national origin or citizenship status as a stand-in for her appearance.

The pleading is even more deficient with respect to Kearns and Marx. As to Kearns, Plaintiff only identifies three allegations: (1) Kearns allegedly told Plaintiff she was not being harassed and was just experiencing "anxiety"; (2) Kearns allegedly said that "Snyder would not be removed"; and (3) Kearns allegedly asked Plaintiff why she was still at the Collier Center after reporting Snyder. (Doc. 46, ¶¶ 31, 34). But, even interpreted in a light most favorable to Plaintiff, those allegations only show Kearns may have been aware of Plaintiff's belief that Snyder harbored discriminatory beliefs toward Plaintiff based on her national origin, not that Kearns individually shared or acted upon a racially discriminatory animus. *Walker*, 286 F.3d at 1274. Finally, Plaintiff does not

identify any conduct or comments by Marx whatsoever from which the Court could infer that she harbored racial discrimination toward Plaintiff or acted because of Plaintiff's race. Therefore, the Court cannot deduce whether Plaintiff has plausibly alleged that a decision-maker was motivated by racial animus and will dismiss Count I.

**B. Hostile Work Environment**

A party may also bring a hostile work environment claim under § 1981. *Shields v. Ft. James Corp.*, 305 F.3d 1280, 1282–83 (11th Cir. 2002). A prima facie case of a hostile work environment requires a plaintiff to establish that "(1) [s]he belongs to a protected group; (2) [s]he was subject to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the conditions of h[er] employment; and (5) h[er] employer was responsible for the hostile work environment." *Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 774–75 (11th Cir. 2024) (quotation omitted). But at the pleading stage, all that a plaintiff must plausibly allege is that intentional racial discrimination caused a contractual injury that related to "the making, performance, modification, [or] termination of contracts, [or] the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Shields*, 305 F.3d at 1282 n.2 (quotation omitted).

First, Defendants argue that most of the allegations do not show Plaintiff faced hostility or disparagement based on race. Secondly, to the extent Plaintiff alleges she was called racial slurs, Defendants argue that the Second Amended Complaint does not allege when that occurred or how often it occurred. In Response, Plaintiff argues that the alleged harassment she faced from Snyder was "brutal" and that this harassment was "[u]nquestionably" because of her race and national origin. (Doc. 51 at 11–12).

Again, Plaintiff's Second Amended Complaint does not appear to focus on the kind of *race-based* hostility that § 1981 requires.[7] As said before, most of the allegations pertaining to Snyder focus only on Plaintiff's Jamaican national origin and citizenship, (Doc. 46, ¶¶ 23–24), and do not include any reference to race, ethnic characteristics, or her appearance, (*id.* ¶¶ 21–22). Only after Plaintiff allegedly reported Snyder for the first time does she assert she faced any kind of race-based harassment from co-workers in the form of racial slurs. But she does not allege how often she faced this treatment or how Snyder exactly condoned that conduct. *See Gonazlez v. Kellogg Co.*, No. 8:15-cv-32-T, 2015 WL 1538151, at *3 (M.D. Fla. Apr. 7, 2015) ("Isolated or sporadic incidents of harassment do not satisfy the 'severe or pervasive' standard of a hostile work environment claim."). Rather, Plaintiff relies only on conclusory allegations that Snyder, Kearns, or others harassed her specifically because of her race. (Doc. 46, ¶¶ 15, 19). To the extent that Snyder, Kearns, or others used her Jamaican national origin as a stand-in for her race, Plaintiff's Second Amended Complaint is devoid of any allegation from which the Court could plausibly infer racial discrimination. *Tonkyro v. Sec'y, Dep't of Veterans Aff's*, 995 F.3d 828, 836 (11th Cir. 2021) (holding that conduct must be "motivated by" the protected characteristic relevant to the discrimination claim and not some other characteristic). Thus, Count III will be dismissed.

**C. Retaliation**

Additionally, "[§] 1981 also encompasses claims of retaliation." *Nevins v. DCH Health Sys.*, No. 25-12124, 2026 WL 1103517, at *4 (11th Cir. Apr. 23, 2026); *Bryant v.*

---

[7] The Court's analysis could change if the claim brought were a hostile work environment based on national origin under Title VII.

*Jones*, 575 F.3d 1281, 1301 (11th Cir. 2009) (citing *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008)). A prima facie case for retaliation under § 1981 requires that a plaintiff allege "(1) [s]he participated in a protected activity, (2) [s]he suffered an adverse employment action,[8] and (3) there is a causal connection between the protected activity and adverse action." *Gildyard v. Children's Network of S.W. Fla., LLC*, No. 2:24-cv-702, 2025 WL 2106675, at *3 (M.D. Fla. July 28, 2025). But Plaintiff need only assert enough factual matter to plausibly allege a claim for retaliation based on her race.

Defendants argue that Plaintiff has not pleaded the first or third elements of a retaliation claim. As to the first element, Defendants argue Plaintiff did not engage in a protected activity because the Second Amended Complaint does not indicate that she specifically reported race-based discrimination. "[I]n order to constitute statutorily protected activity capable of supporting a § 1981 retaliation claim, an employee's complaint must reasonably convey that she is opposing discrimination based specifically upon race, versus some other type of discrimination or injustice generally." *Cochran v. S. Co.*, No. 14-569, 2015 WL 3508018, at *2 (S.D. Ala. June 3, 2015) (quotation omitted).

When Plaintiff asserts that she reported Snyder on October 30, 2020, and November 2, 2020, she merely alleges that she reported his "harassment," not that she specifically reported any racially discriminatory behavior. (Doc. 46, ¶ 26). Plaintiff further alleges she reported Snyder's "behavior" to PGCI's HR manager "multiple times" between

[8] To the extent Defendants argue that Plaintiff's Second Amended Complaint is deficient because it does not allege a *serious or material* adverse employment action, that argument fails. In 2024, the Supreme Court abrogated Eleventh Circuit precedent that held an adverse employment action must be a "serious and material change" in the terms, conditions, or privileges of employment. *Muldrow v. City of St. Louis*, 601 U.S. 346, 353 & n.1 (2024) (citing, among others, *Webb-Edwards v. Orange Cnty. Sheriff's Off.*, 525 F.3d 1013, 1033 (11th Cir. 2008)).

October 2020 and May 2021, and that she also reported his "conduct" to PCGI's Chief Financial Officer on May 6–7, 2021. (*Id.* ¶¶ 27, 32). It is *possible* that conduct could include Snyder's alleged "knowledge and support" of Plaintiff's colleagues calling her racial slurs after she initially filed complaints. (*Id.* ¶ 28). But Plaintiff does not precisely plead when she was allegedly called racial slurs; so, it is equally possible she reported some other kind of discrimination. (*Id.*). Without that detail, the Court cannot conclude Plaintiff plausibly alleges that she engaged in a protected activity relevant to her § 1981 retaliation claim, or that any adverse action was causally related to such an activity. *See Gildyard v. Children's Network of S.W. Fla., LLC*, No. 2:24-cv-702, 2025 WL 1093331, at *7 (M.D. Fla. Apr. 10, 2025). Accordingly, Count IV will be dismissed.

**D. Constructive Discharge**

Finally, Defendants argue that Plaintiff's claim for constructive discharge must be dismissed because she fails to plausibly allege a race-based hostile work environment claim. The Court agrees. *Smith v. Ace Towing & Recovery, LLC*, No. 5:23-cv-1761, 2025 WL 1547735, at *3 (N.D. Ala. May 30, 2025) (holding that the "[c]reation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case" (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 149 (2004))). Accordingly, the Court will dismiss Count V of Plaintiff's Second Amended Complaint.

**E. Leave to Amend**

"A district court is not required to grant a plaintiff leave to amend h[er] complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court." *Wagner v. Daewoo Heavy Indus*. Am. Corp., 314 F.3d 541, 542 (11th Cir. 2002). Plaintiff has neither filed a motion

for leave to further amend her pleading nor requested such relief in her Response. Consequently, this Court is not obligated to permit Plaintiff to amend her pleading *sua sponte*. Nevertheless, the instant Motion and Response addressed over twenty different claims brought by five different Plaintiffs, and only one Plaintiff remains in this case. That necessarily limited the briefing applicable to Plaintiff's claims, which have not been dismissed prior to this Order. Therefore, in the interests of justice and for the benefit of the Court, Plaintiff will be afforded one final opportunity to amend her pleading as to Counts I, III, IV, and V.

## IV. CONCLUSION

Accordingly, for the reasons stated herein, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendants' Motion to Dismiss Second Amended Complaint (Doc. 48) is **GRANTED** as set forth in this Order.
2. Count II of the Second Amended Complaint is **DISMISSED with prejudice**.
3. Counts I, III, IV, and V of the Second Amended Complaint are **DISMISSED without prejudice**.
4. On or before **August 31, 2026**, Plaintiff may file an amended pleading to correct the deficiencies noted in this Order. Failure to timely file an amended pleading may result in the dismissal of this case without further notice.

**DONE AND ORDERED** in Jacksonville, Florida on August 18, 2026.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record